Your Honors, we believe that Judge Martone erred when he granted summary judgment on the insurance company's motion for summary judgment for this reason. He did not consider an uncontroverted affidavit that was in the record that shed light on the letter that became the focal point of his entire opinion, which involved this February 5 meeting that had occurred and transpired with the clients. That affidavit needed to be construed most favorably to appellants, and it was not. Judge Martone focused on a few specific items of an April 27, 2004 letter written by the client. The first point he focused on was a statement by the client, it is time to bring your representation of us in the Princess matter to an end. But what he didn't consider is in the affidavit, which was uncontroverted by Mr. Hebert, was that, in fact, during the February 5 conversation for which this letter originates, there was a discussion that the litigation department at the Hebert Schenk firm was too busy and might not be able to handle the ongoing litigation, which was the next step. At which point Mr. Nolan, the plaintiff in the underlying case, suggested that he would look to see about getting other counsel to handle that part of the case. And so when you see a statement in the record that says it's time to bring our representation to a close, it is now an ambiguous statement, because what was really being discussed and what we don't ultimately know, because Judge Martone didn't address it and he granted summary judgment, was was the client, in fact, following through with what the client had said it was going to do to begin with, which was I'm going to look to see about other counsel. Now, it was before any of this letter was ever written. And what you're arguing is that as a result of this, it would be subject to an opinion as to whether or not a malpractice action might be filed. That is correct, Your Honor. And so the most that could be in favor of the insurance company would be legal fraud as opposed to actual fraud. That's right, Your Honor. And that would require a decision by a jury or a finder of fact and would be inappropriate for a summary judgment resolution. Yes. Under the equitable life case, that is correct, especially because in Arizona you look to the facts themselves to decide ultimately is it going to be a matter of law where no reasonable minds can differ versus a question that has to be resolved. But the affidavit even goes further in attacking the foundational letter upon which Judge Martone ruled. It says I'm going to stop by and pick up my file. Well, that's not really correct. What was ongoing were there were original documents that had been given to the lawyers. And the client had asked for those originals to be given back because those originals would be needed to go to another lawyer. And so although it sounds like maybe the client is asking for their file back, that's not what the affidavit explains to us. So what we have, Your Honor, is really when you take out those two rather extreme statements, one, our representation is now coming to an end, and, two, I want my file, and put them in the context of that affidavit, which was not considered by Judge Martone, it becomes a fact issue that should have been left for a jury to decide. But there's more to it. In addition to that, what we also know is that Mr. Nolan in the record did not even himself think he was claiming or making a claim that he was going to take these lawyers to task on malpractice. He didn't make that decision until May. And it was even after May after he consulted with some lawyers. So in his testimony, which is part of the record, he indicated that even as of the April 27th letter, he himself had not intended that to be some sort of a statement of any kind. You had the affidavit of a, in the record, of Don Breyer. Don Breyer was uncontroverted. He is an expert underwriter in professional liability matters. In fact, he's a registered professional underwriter. He said that that question in the application by James River called for an opinion. And if you think about it, it makes sense. Most applications for E&O coverage talk about circumstances, acts, errors, or omissions. This one is rather unique. This one talks about circumstances, allegations, tolling agreements, or contentions. Using a shoot as generous, one would say that the circumstances, therefore, that that particular question is linking to is what all of those other phrases are linking to. Litigation. Litigation orientation by contentions, allegations, tolling agreements. So what you have in the record is two affidavits from lawyers themselves that went uncontroversial. Mr. Aiken saying, I interpreted this to be an opinion. Mr. Hebert saying, I interpreted this to be an opinion. You've got the underwriter who went uncontroverted saying it is an opinion question. And then you've got this split of authority, although if you look very carefully, almost all of those cases deal with the circumstances, act, omission language, not this unique litigation-oriented language. I understand your position on that part of the case. I want to focus just for a moment on the counterclaim. Yes, Your Honor. Given the fact that the insurance company did in fact represent your clients, does your client agree that that counterclaim was properly dealt with by the district judge? No, Your Honor. Okay. Why not? Well, first of all, the counterclaim in and of itself embodied various allegations, and we linked in our brief every allegation to a case in Arizona that establishes those are proper grounds for bad faith assertions. What happened in this case was the insurance company filed a summary judgment focused on the duty to defend. We responded saying our complaint is much, much broader than that, so that they in their reply came back and limited it. So they said to the extent you are seeking bad faith because of a failure to defend, we believe we should have summary judgment granted. Well, in light of that, the judge overstepped his boundaries, because what he did was he ultimately ruled that the entire bad faith case was taken out of the case, saying that and focusing just on the complaint itself. He didn't even consider the after the complaint conduct that had occurred through the motion practice itself, which was the disclosure of attorney-client information in violation of Parsons, as well as the exposing of the letter to plaintiff's counsel by not sealing it in the record. Those were additional grounds that were Parsons violations under Arizona law that occurred even after the complaint. What Hebert should do. You amend the complaint to specify those? Well, it had just come up, Your Honor. I understand that. We had not yet attempted to amend the complaint, but, of course, the issues can be joined and tried by consent. And obviously, we were already indicating in our motion for summary judgment that we were still asserting all of these rights, that these other violations. So as to the portion relating to the defense, you would have to agree that since they did defend, that part goes away. But you're, I gather, alleging that there were other parts of the counterclaim that the judge simply wrapped into one big bundle and disposed of it, and that was wrong. Yes, Your Honor. In particular, it got to the failure to investigate. They never spoke to Mr. Hebert. They never spoke to Mr. Nolan. And under the Orm School v. Reed's case in Arizona, which also relies upon U.S. Supreme Court precedent, when you're the move-in party to a motion for summary judgment, you're not obligated to prove a negative. That case deals with the move-in, but the same rule applies to the non-move-in. If you're not the move-in, you don't have to come forward and try to prove a negative. Here, it's clear in this record they failed to investigate to the extent that they never talked to their insured to ask him what happened on May, on June, on February 5th. They never asked. And that gave rise to a failure to investigate claim. The issue of the defense, by the way, Your Honor, the way we were characterized, it sounded like somehow we were trying to allege it all along. There was a $50,000 self-insured retention. And at the times that James River was asserting that there were attorney's fee, that they were assuming the defense, that threshold had not been breached yet. So they hadn't actually been providing the defense itself. They did provide the motive. What evidence was produced by your client that there was bad faith on the counterclaim portion of this from the insurance company and, more specifically, that James River's conduct was consciously unreasonable? What evidence did they produce? Well, first of all, Your Honor, one can infer from the – well, I'm going to have to divide it into two parts. Okay. As to the counterclaim prior to the disclosure of information. Right. There was a failure to investigate. Even the most basic of information was not received. That in and of itself creates a question of fact as to whether it was bad faith. But that's an inference. So I'm asking for – in the motion for summary judgment, what did you produce that provided the evidentiary indicia of a prima facie case there? It's actually what they produced. They produced billings unredacted. James River went to a split file, went to the confidential file of the defense case, which was ongoing, took attorney-client-privileged billing statements, attached them to their motion for summary judgment without taking any precautions. And in Arizona, you can infer from reckless conduct the state of mind. That at least is an inference, Your Honor. What about the standard of conscious unreasonableness? That can't be unconscious. It's got to be conscious or a knowing unreasonableness. Isn't that correct? Well, you can prove it either by direct evidence or because the conduct is so reckless that it creates the inference under Arizona law. This is almost a race of solaquitur approach you're taking to this. Well, I have to say, Your Honor, I don't think it takes much to imagine that when an insurance company reveals the unredacted defense bill showing everyone who had been talked to the entire strategy of the case under the guise that, well, since you alleged that we hadn't paid the bills, we're going to attach bills instead of an affidavit, which they could have done. That in and of itself is so extreme and so reckless for a lawyer to not understand and know, one, you can't invade that file, and second of all, you can't disclose that because of the prejudice to the insured. We believe you can assume there's an inference of state of mind there. Secondly, there was a letter written in an attempt to try to get Heber, to try to get the insurance company to participate in mediation. Now, admittedly, this was a letter that went to counsel on the coverage side as well as counsel in the underlying defense. But the near fiduciary-like relationship nevertheless governs what should have been done with that letter. And everyone agrees the case was still, there was still coverage under the policy. There's never been an attempt to rescind the policy just to deny this claim. And what counsel did without any explanation was to take the blueprint of the defense counsel explaining all of the weaknesses of the insurance case and publish it to the world. And, in fact, it was used in depositions by the plaintiffs. There is simply no reason for that. There was no basis to do that. And the dramatic impact linked to the billings themselves for attorney-client privilege as well as this very sensitive letter we believe at least creates an inference that should have withstood summary judgment. Your Honor, unless the Court has any questions, I'll just reserve the rest of my time. That's fine. Thank you, Your Honor. Very good. Then we will hear from Martha Gibbs. Is that correct? May it please the Court. I'm Martha Gibbs on behalf of James River Insurance Company. And with me at counsel table is my co-counsel, Amy Sandberg. Will she be sharing any of your time at the podium? I wasn't planning on that, Your Honor, unless you have a question that only she could answer. Not trying to force her up there, just wanted to know whether we're going to be splitting time. No, Your Honor. I would like to say that counsel for Hiebert-Chenk has put a very gloss on, a good gloss on what is a devastating letter. I'm referring to the Nolan letter from Mr. David Nolan to Jack Hiebert that really is at the heart of this whole matter. This is not a minor matter, as Hiebert-Chenk would contend. It starts out talking not only about bringing your representation of us in the Princess Manor to an end, it goes on to talk about, without a doubt, you have abandoned us as well. He then goes on to talk about, this is despite your advice to us, he hasn't heard from Mr. Hiebert, despite your advice to us that we should file a lawsuit against Wall in order to secure some future recovery potential for our $2.64 million investment. It's a devastating letter. Well, let me ask you. I practiced law for 37 years and had all insurance during that time, so I'm very familiar with these kinds of issues. As I understand the letter, Mr. Nolan indicated that, and I'm quoting, we could bring the matter to a close by simply waiving the fees and returning the documents. Does the insurance company dispute that? That he said that in the letter? No, Your Honor. You don't dispute it or you do dispute it? We don't dispute that that's what he said in the letter. Okay. That it's possible that that's all that could have happened. Okay. So you're a law firm, busy law firm, you get this letter from a client, the client is really unhappy, and the letter says, look, we can get this all resolved. You waive your fees, you give us the documents, and we're done. Happens all the time, unfortunately. What's so unusual about that letter? I think this letter goes beyond that. When talking about it's the abandonment, the fact that they can't have their phone calls returned, their e-mails, that they're treated more like an adversary, the amount of money involved. And I would also link that in to what my opponent doesn't want to talk about too much, and that's question 2C, the tenancy, excuse me, on the application. It's quite broad, and it talks about any circumstances, allegations, tolling agreements, or contentions as to any incident which may result in a claim being made. It is. And that gets to the opinion issue, doesn't it? Yes. But I think that under the facts of this case, this devastating letter is, under any reasonable person's standard, would fall within something that should be reported. Okay. So what I'm understanding you to say is that the explanation that I threw out for discussion purposes, that this was, at least by some people's standards, a letter saying, hey, look, let's have an accord and satisfaction the way the law students who are with us here today will understand it. Let's have a, you know, you waive your fees, you give us the documents back, we're done. Why isn't that a reasonable interpretation that a normal person could ascribe to that? I don't think that this letter goes that far as saying I'll be perfectly happy if you just write it. I didn't say they'd be happy. They just said we'll settle this for that. Well, perhaps if it had been a letter talking about preserving a $5,000 investment, perhaps. But it's $2.264 million, which I think brings it into a whole other area. But isn't it the case that these folks were retained basically to see if there's anything that could be done? They weren't involved in litigation, were they, on behalf of the Nolans? Well, Mr. Hebert spoke to them about litigation, and he was supposed to get someone in his firm. I understand that. But they never actually undertook the litigation. No, that was part of the problem. They were basically investigating him. That's what Mr. Nolan refers to in the letter. I understand that. And they have, and Mr. Hebert, I gather, admitted, hey, you know, we blew it. We just blew it. He did. And in his response, two days later, he sent them a letter that said you are absolutely right in everything you've said. And he apologizes profusely. I think the magnitude of what had happened, the malfeasance, if you were, the nonfeasance was coupled with the amount of money and then coupled with the broad standard that it's something. It isn't that there had to be a claim letter already, but it was circumstances, contentions as to any incident which may result in a claim being made. I understand that. But, again, you know, I understand I'm playing devil's advocate with you here. I want to understand why the insurance company is so set on the idea that this letter was so out of the ordinary course, so shocking, that anybody would by definition have to treat this as a claim that was going to be made or may be made when, in fact, there had never been, nobody said, hey, we're going to sue you if you don't do this or I'm going to go see a lawyer about filing a malpractice claim. Isn't that correct? That's true. But I would point out that, first of all, he did, the Nolans did sue. So it wasn't. I understand that. But at the time this letter came in, they had not threatened to sue. They, as far as the record shows, they hadn't gone to another lawyer yet. And they simply sent this letter. They wanted the documents. They wanted the fees waived, both of which occurred, I gather. So I, what I'm, the purpose of all this is to understand, you know, we've got these two different kinds of fraud, actual and legal fraud. I don't think there's anything in the record to show actual fraud because there's no scienter shown, right? So we're really talking about legal fraud here. And that, under Arizona law, really gets to an opinion, does it not, in this case? I would say no. I would say, Your Honor, I haven't been practicing as long as you, but I've been practicing for 33 years. And if this letter came to me from a client and we are taught at our law firm, we would have to go to one of our loss prevention officers and report this immediately. This is just not something that can be taken lightly. This is not. No, I'm not suggesting it be taken lightly. And I think, therefore, it does rise to the level of reportability under 10C. Okay. But do you agree that, since it's just legal fraud we're talking about here, that it really is an issue of an opinion? Reasonable people can disagree. I agree with Judge Martone at the district court that reasonable people could not disagree. Okay. So you're saying that when a letter of that nature came in under the facts that no reasonable juror could possibly believe that the letter meant anything other than, boy, we better call our malpractice carrier? They shouldn't call their current malpractice carrier, but remember, we're talking about filling out an application. I understand that, yeah. In the context of 10C. Right. And is it reportable under 10C? Should it have been? Right. And also there is a continuing duty in Arizona to disclose when you're fulfilling insurance applications. What is the presumption in Arizona with respect to insurance policies? If there's ambiguity, is it construed against the insurance company? Oh, of course. You know, Justice Feldman would, yes, there's no doubt that they're construed in favor of the insurer, but we don't think there's an ambiguity. I just want to point out that. I understand. But from the perspective of the court, if we see an ambiguity, we really wouldn't have any choice, would we, but to send this back to the district court for trial? If you were to say that it was ambiguous, yes, but I don't think that it is ambiguous. And I want to point out that the application form, they make a big point of the fact that it wasn't from James River. The reason it wasn't from James River is because the Hebert Schenck insurance broker, the Mahoney Group, gave them a form so they could shop it around to numerous insurance companies. You shouldn't lose a lot of sleep about where the form came from. Pardon? Oh, okay. Unless you have any more questions, I'd like to talk a little more about one other thing they've mentioned in their reply brief, the awareness provision in the policy, and they're trying to say that's the equivalent of a section 10C question, and that therefore it wasn't reportable because they didn't have the amount of information that's required under the awareness provision at the time of the Nolan letter. I would say the two things are apples and oranges. The 10C is designed to exclude something from coverage when a policy is issued. The awareness provision is how something is brought into coverage once you are a policy holder. And so at that point, the insurance company needs all this information because insurance companies are all about risk assessment. They need to know what risk they're facing, whereas if it's something that's being excluded, like in 10C, they don't need that level of information. What's your take on Mr. Plitt's argument that on the counterclaim, that while they concede that the insurance company did in fact provide representation, that there were other elements of the counterclaim that the district court should not have rolled into one big ball and dismissed it? I have two points. First of all, he's completely glossed over what was attachment 3 to their counterclaim, which is the letter from a law firm in Los Angeles, Lewis, Breeze Guard and Smith, about some other insurance policy denying coverage. That was the genesis of their entire counterclaim. That is why they brought it. It had nothing to do with James River. It references a different policy number, a different policy period. So it's your position that there simply was no evidence, and this was summary judgment, since there was no evidence on that, on any of the counterclaim in that regard, that it was properly dismissed? Yes, and for another reason as well. What they're talking about and what counsel talked about this morning was this failure to investigate, supposedly. And they referenced certain things like the they criticized James River's handling of the claim, the processing, the investigation. And all that seems to be based upon the view that if the insurance company had investigated it differently, it would have resulted in a finding of coverage instead of no coverage. I think Judge Mortone had just decided there was no coverage because of the devastating nature of the Nolan letter that fell within 10C, therefore, the Arizona statute applied, there was no coverage for the claim. So therefore, all these other things about investigating and processing and handling the claim and so forth just fell apart. So if, if, if, arguendo, if, if we found there was an ambiguity and it was an opinion involved and we send it back on the summary judgment, then that also resurrects by what I understood you to just say, the counterclaim at least as to the portion other than the providing of defense. I would say, I would not agree with that either, Your Honor, because the, it was clear that the failure to provide a defense was the heart of both count one, breach of contract in the counterclaim, and count two, bad faith. In fact, I think if you look at paragraph 23 of their counterclaim, after they've listed these various allegations as to what James River didn't do properly, this is all of this resulted in a failure to provide a defense and it's therefore injured by Hebert Schenck. It's, that, that's what was driving the bus of the counterclaim was always the failure to provide a defense. Also, he references the fact that certain bills and so forth were attached on a summary judgment motion. I would point out that that summary judgment motion was filed several months after they filed their counterclaim. So obviously, that was not the basis for what they, for filing their counterclaim. And the fact that they were attached, James River was really put in an incredible situation. It had been paying bills for the defense in the Nolan lawsuit since, I believe, February of 2005, and yet its own insured was suing it and claiming that it wasn't providing a defense. So I think it was forced into having to provide that information. Kennedy, it sounds like it depends what is, is. Yes. And also when they moved to put that material under seal, James River did not oppose that, and that was granted and that was done. As far as the latter that was included in part of the summary judgment papers, of course, there wasn't any attorney-quiet privilege because it was from the counsel for Heberchenk and underlying Nolan suit to coverage counsel for James River in an adversarial position. And also that letter went on to talk about how they thought the Nolan lawsuit was, I think the word was ridiculous, and how there were strong defenses. Sorry, is it, is it the insurance company's perspective that it's in an adversary position with its insured, and no matter what the insured provides to the insurance company, that it can deal with it as any adversary would? No, not at all, Your Honor. I'm talking about the unique situation here where they're denying that we were defending them. Therefore, we were forced to produce this. Also, there was, it's not a situation in which James River used anything in the letter or in these bills from the Jonas Skelton law firm in order to deny coverage. The January 12th, 2005 letter that Ms. Sandberg wrote to Heberchenk explained that coverage was being denied on the basis of the Nolan letter, and that position never wavered throughout the litigation. So there was nothing that came out subsequently that was used to the disadvantage of the insured. When the district court said that the question on the application called for a matter of statement of fact, basically, is the district court in making that determination, making a determination a factor of law? I think it's a question of law, that no reasonable fact finder could decide. Otherwise, it is. Well, that kind of, I mean, that's the thrust of my question. Does he have to say no reasonable fact finder could call this a request for an opinion? Or can he just say, I'm the judge and I look at this, and I'm construing a writing and I've decided that this really calls for a fact, not for an opinion? Well, he found that no reasonable fact finder could find it. So I think even under that lesser showing, if you will, it was a matter of fact. I would also point out that if the Court is concerned on this fact-opinion distinction, which is sometimes in the other cases called the objective-subjective distinction, that two of the cases that Hebershek relies upon, there is a New Jersey case, Liebling, and a Wisconsin case, Inouye, Astort, a State of Nolan. And they both use a subjective test, and they both grant summary judgment for the insurance company on the basis that under that evidence, no reasonable fact finder could believe that the attorney's opinion really was that this matter shouldn't have been disclosed in whatever the insurance application was. And I think that's an alternative basis to uphold what happened here, that the evidence was so strong that there was only one conclusion to be reached under either objective or subjective distinction. Kennedy, I understand that all reasonable people would say it had to be one way. Then you can go ahead and decide it. That's what we believe, based upon the devastating nature of the Nolan letter, that there was really only one conclusion. The judge, of course, thought it asked for fact, but you're standing on both legs. Yes. Unless the Court has any other questions, that concludes my presentation. Thank you very much. We'll hear a rebuttal argument. To follow up on the Court's questioning about waiving fees and giving documents, in the record is Jack Hebert's memorandum dated April 29, 2004, where, one, he says, we are delivering to your house those documents, and, two, quote, the balance on your account will, of course, be written off. And so there was some indication that they were complying with what the insured had indicated they wanted in this matter. What is your take on the question that Judge Canby just raised? Did the judge have the right under Arizona law to determine, as a matter of law as opposed to a fact-based determination, that no — it's a writing he's construing and that no reasonable juror could possibly interpret that as calling for an opinion? Did he have the right? Of course. Courts do that all the time. That is a standard they have to reach. Did he have the right facts in this case? Absolutely not. And he didn't even consider the affidavit of Mr. Hebert. So in this situation, Arizona's got this slight issue. How do we know he didn't consider the affidavit? He didn't discuss it, is that what you're saying? I'm sorry? How do we know he didn't consider the affidavit if he doesn't cite to it, doesn't talk about it, it's just absent? And so we must assume, since he doesn't deal with it, he deals directly with the letter, and since it is relevant, we can only assume that he must have overlooked it or chose — well, we can't even say he chose not to consider it, because he didn't say, I choose not to consider it. And that affidavit was attached to your opposition paper? It was attached to the Statement of Facts, Your Honor. Additionally, we do have a lot of record evidence that this is a subjective question using the sliding scale. We have two lawyers, their affidavits, but granted, they're the lawyers involved. You've got a professional registered underwriter who went unopposed saying that, you've got a split of opinion in the country on this issue, and you've got the Third Circuit at least saying when you've got a split of opinion like that, it is by definition almost a debatable issue. And so when you take all of that into consideration, and we're dealing with a There's simply a question of fact, that the judge should have allowed the case to go forward and be resolved by a trier effect under Arizona's version of how do you resolve these issues. As to the litigation, His Honor asked a question about can an insurance company in litigation, once they assume this adversarial role, simply do so with abandon? The Tucson Airport Authority case in Arizona says no. In fact, that was a case where there was a split. There was an underlying case going on, and there was a declaratory judgment action, and the insurance company attempted to pressure in the underlying case certain results from the insured so that if the insured didn't play ball with the insurance company, they were going to withdraw their defense. Then, after they got the coverage determination, they pulled the defense anyway. And what the court said is that created a question of fact for a jury as to whether or not there was bad faith. Here, when reason – I have a favorite saying, the 40 bishop rules. If 40 bishops decide something, you know, that means something. I dare say, Your Honors, if you've got 40 lawyers in a room and you ask them this simple question, if you have the choice to provide either an affidavit saying you're fronting a defense or you're going to disclose your client's, attorney client, billings unredacted, which do you think you would do? Not one of them would say, well, by gosh, let's just take it upon ourselves to let the other side see our entire blueprint of the case. Let's take it upon ourselves to waive attorney client privilege where we don't even have that right and publish it to the public. I submit to the court that in Arizona, you can infer state of mind from reckless conduct. At a minimum, that is reckless conduct. The letter is a little more removed. The letter really gets us into the very heart of this near fiduciary-like relationship. You know, you see that in every case and nobody ever says what it is. But it's something less than a fiduciary obligation, but something more than just arm's length. Here, a reasonable attorney looking at that letter would not have attached it because there was no reason to attach it. And that violated that near fiduciary obligation, or at a minimum, again, was so potentially reckless that it creates an inference that should at least allow a jury to decide that issue, Your Honors. What would it be called? Is it a breach of fiduciary duty? Is it a bad faith? What is it? If your position is correct, what's the underlying cause of action for that? Your Honor, I write a lot. I publish a lot. And I have to tell the court, I'm not sure. There's not one case in the country that talks about what it is. They all use the buzzword near fiduciary-like relationship. I believe what it is is a breach of the implied covenant of good faith and fair dealing, which requires both parties, in Arizona at least, it is a reciprocal duty that requires both parties to not do something that impairs the rights of the other under the contract. One of those rights here is to be able to talk to your insurance company with some confidentiality so that you can talk about things like, gee, our case is not good, we really have to maybe settle this because maybe I did something wrong, the entire attorney-client relationship requires that, and the tripartite relationship, which they never stopped, stepped out of, requires that. To answer His Honor's question, I believe probably the clearest way you could look at it is to say it is a violation and breach of the covenant of good faith and fair dealing, but that's my best shot at it, Your Honor. Any other questions of the court? I don't think so. Thank you, Your Honor. We thank you both for your fine presentations. The case of James River Insurance Company versus Schenck is submitted, and we will now consider our last case for the day, Budnick versus Town of Carefree, Arizona.
judges: Canby, Thompson, Smith